UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

v.

CHARLES MENSAH,

Defendant.

**DECISION AND ORDER**
09-CR-203S

## I. INTRODUCTION

On February 27, 2012, after a three-day trial, the jury returned a guilty verdict against Defendant Charles Mensah, on a two-count redacted indictment, charging him with violating 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B), and 841(b)(1)(C) (conspiracy to possess with intent to distribute, and to distribute, 50 grams or more of a mixture and substance containing a controlled substance), as well as violating 21 U.S.C. § 843(b) (use of a communication facility in committing, causing, and facilitating commission of acts constituting felonies).

Presently before this Court is Defendant's post-trial motion for a judgment of acquittal, pursuant to Rule 29(c), or a new trial pursuant to Rule 33(b)(2) of the Federal Rules of Criminal Procedure.[1] The Government opposes the motion. For the reasons discussed below, Defendant's motion is denied.

[1] The submissions relevant to this motion are docket numbers 560, 561, and 565.

## II. BACKGROUND[2]

The evidence at trial established that Defendant purchased ecstasy pills from Joseph Abbey from at least March to June of 2009. Recordings of wiretapped conversations showed Abbey and Defendant discussing purchases of large quantities of ecstasy pills, and Defendant's plans to travel to New York and Chicago to distribute the drugs. Additionally, following his arrest on June 17, 2009, Defendant admitted to purchasing ecstasy pills from Abbey and distributing them to others at a profit.

Other evidence showed that Abbey also supplied ecstasy pills to Brianne Aguinaga. Aguinaga in turn distributed the pills to Kristin Bermingham who sold them to an individual cooperating with the government. Through that individual, the Government made a total of five controlled purchases of ecstasy pills between June of 2007 and May of 2008. Laboratory reports showed that the ecstasy pills recovered from these controlled buys contained methamphetamine, MDMA, and BZP.

At trial, following the conclusion of the Government's case-in-chief, Defendant argued that the evidence submitted did not establish that Mensah participated in a conspiracy beyond his relationship with Abbey. Further, Defendant contended that the involvement of individuals like Birmingham pre-dated Defendant's own involvement, and thus narcotics seized in relation to them could not be used against him.

After limited briefing, this Court denied Defendant's motion as to the conspiracy charge and one charge of using a communication facility in facilitating the commission of a felony. The Court granted Defendant's motion as to another count of using a communication facility on the basis that the time listed for the relevant phone call differed

[2] This Court assumes familiarity with the pretrial proceedings and trial evidence.

between the indictment and the evidence presented at trial.

Following closing arguments, Defendant renewed his request for a judgment of acquittal. After being granted an extension, Defendant filed his motion on March 15, 2012. Briefing on the motion concluded April 12, 2012, at which time this Court took the motion under advisement without oral argument.

## III. DISCUSSION

### A. Rule 29[3]

Rule 29(a) provides, in pertinent part, that upon the defendant's motion, a court must "enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." The focus of a Rule 29 motion therefore falls on the sufficiency of the evidence presented in the government's case-in-chief. See United States v. Saneaux, No. 03 CR 781, 2005 WL 2875324, at *2 (S.D.N.Y. Nov. 1, 2005).

A defendant challenging the sufficiency of the evidence bears a heavy burden. See United States v. Autuori, 212 F.3d 105, 114 (2d Cir. 2000); United States v. Walker, 142 F.3d 103, 112 (2d Cir.1998). A district court may enter a judgment of acquittal on the grounds of insufficient evidence only if "after viewing the evidence in the light most favorable to the prosecution and drawing all reasonable inferences in the government's favor, it concludes no rational trier of fact could have found the defendant guilty beyond a

[3] Defendant also makes his motion under Rule 33. While the standards governing Rule 29 and Rule 33 motions are similar, the Second Circuit has commented that "[g]enerally, the trial court has broader discretion to grant a new trial under Rule 33 than to grant a motion for acquittal under Rule 29, but it nonetheless must exercise the Rule 33 authority sparingly and in the most extraordinary circumstances." United States v. Ferguson, 246 F.3d 129, 134 (2d Cir. 2001) (citation and quotation omitted); see also United States v. Costello, 255 F.2d 876, 879 (2d Cir. 1958) ("It is well settled that motions for new trials are not favored and should be granted only with great caution."). However, although Defendant's motion cites both Rules 29 and 33, his supporting memorandum discusses only the legal standard for Rule 29. It also does not raise any separate ground on which this Court should exercise its discretion under Rule 33, and indeed only requests relief pursuant to Rule 29. Accordingly, this Court will only consider the sufficiency of the evidence in determining whether acquittal is warranted.

reasonable doubt." United States v. Reyes, 302 F.3d 48, 52 (2d Cir. 2002); see also United States v. Jackson, 335 F.3d 170, 180 (2d Cir. 2003); United States v. Skinner, No. 03-CR-11, 2005 WL 782811, at *1 (W.D.N.Y. Apr. 6, 2005). Stated another way, "the court may enter a judgment of acquittal only if the evidence that the defendant committed the crime is non-existent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." United States v. Guadagna, 183 F.3d 122, 130 (2d Cir. 1999) (citation and quotation omitted).

When considering the trial evidence, "the court must be careful to avoid usurping the role of the jury." See Reyes, 302 F.3d at 52. The court is not permitted to "substitute its own determination of the weight of the evidence and the reasonable inferences to be drawn for that of the jury." Guadagna, 183 F.3d at 130 (internal quotations and citations omitted). The court must give "full play" to the jury's credibility determinations, weighing of the evidence, and drawing of justifiable inferences of fact. See United States v. Spadoni, No. 00-CR-217, 2005 WL 2275938, at *3 (D. Conn. Sept. 15, 2005) (citing Guadagna, 183 F.3d at 129).

**B. Defendant's Motion for Acquittal**

"In order to convict a defendant of the crime of conspiracy, the government must show that two or more persons entered into a joint enterprise for an unlawful purpose, with awareness of its general nature and extent." United States v. Torres, 604 F.3d 58, 65 (2d Cir. 2010). This requires showing that Defendant "agreed to participate in what [Defendant] knew to be a collective venture directed toward a common goal." United States v. Geibel, 369 F.3d 682, 689 (2d Cir. 2004) (quoting United States v. McDermott, 245 F.3d 133, 137 (2d Cir. 2001)). "In assessing whether the government has met its

burden, we look to the government's evidence of the 'interrelationship and interdependency' of alleged co-conspirators, as well as 'the nature and duration of the enterprise.'" United States v. Kapelioujnyj, 547 F.3d 149, 155 (2d Cir. 2008) (quoting United States v. Beech-Nut Nutrition Corp., 871 F.2d 1181, 1191 (2d Cir. 1989)).

However, a defendant need not be aware of every detail of a conspiracy, or every other member. McDermott, 245 F.3d at 137; United States v. Nusraty, 867 F.2d 759, 762 (2d Cir. 1989). It is enough if the Government proves "a permissible inference, from the nature and scope of the operation, that each actor was aware of his part in a larger organization where others performed similar roles equally important to the success of the venture." United States v. Vanwort, 887 F.2d 375, 383 (2d Cir. 1989).

Finally, where, as here, an indictment includes a weight-related provision, the Government must show that a "co-conspirator defendant at least could have reasonably foreseen the type and quantity of the substance about which [he] conspired." United States v. Adams, 448 F.3d 492, 500 (2d Cir. 2006).

Defendant advances three arguments in favor of acquittal. First, he argues that acquittal is warranted for lack of any connection between him and other co-conspirators like Bermingham and Aguinaga. Second, there being no relationship, Defendant asserts that the laboratory reports introduced at trial, describing the narcotics seized from other co-conspirators, cannot form the basis for the controlled substances Defendant allegedly distributed. Defendant further argues that there is no evidence that he and Abbey were discussing narcotics transactions during the wiretapped phone conversations because neither the word "ecstasy" nor "pills" appears in any of the conversations. Third, Defendant argues that, as the Government has failed to prove that his actions involved a controlled substance, so it cannot prove that he used a telephone to commit, cause, or facilitate a

felony.

Upon careful consideration of these arguments and the Government's response, this Court finds Defendant's arguments unpersuasive.

As to Defendant's first argument, even accepting that Defendant may not have known any co-conspirator other than Abbey, this is not fatal to the Government's case. Even knowing a single member of a conspiracy can be sufficient to uphold a conviction. See United States v. Huezo, 546 F.3d 174, 180 (2d Cir. 2008) (citing United States v. Manarite, 448 F.2d 583, 589 (2d Cir. 1971)). In United States v. Magassouba, No. 03 CR 985(RPP), 2010 WL 624284, at *1-*2 (S.D.N.Y. Feb. 22, 2010), the Government relied exclusively on wiretap evidence to tie the defendant to heroin transactions. The defense argued, as Defendant argues here, that evidence relating to three alleged members of the conspiracy with whom Defendant had no contact was improperly admitted at trial. The court, holding that a personal connection between these individuals and defendant was not needed, observed that "in order for evidence related to co-conspirators to be relevant and admissible, the Government need not demonstrate an illicit connection between each and every member of the alleged conspiracy, but only a connection between the unindicted co-conspirators and the conspiracy." Id. at *8-*9. Similarly here, there was no evidence that Defendant actually knew, with the exception of Abbey, any other co-conspirators. Regardless, because Abbey supplied ecstasy pills not only to Defendant, but also to Aguinaga, who in turn distributed them to Bermingham, the Government proved a sufficient connection between all the individuals and the conspiracy. Under these circumstances, the fact that Abbey did not introduce Defendant to other individuals in the conspiracy, or himself know some of the distributors, like Bermingham, is irrelevant.

Defendant's related contention that, having no relationship to the other co-

conspirators, the evidence at trial established, at most, that he purchased drugs from Abbey, is similarly unpersuasive. Although "[i]t is clear . . . that the existence of a buyer-seller relationship does not *itself* establish a conspiracy . . . where there is additional evidence showing an agreement to join together to accomplish an objective beyond the sale transaction, the evidence may support a finding that the parties intentionally participated in a conspiracy. United Stated v. Hawkins, 547 F.3d 66, 72 (2d Cir. 2008) (emphasis in original). Such a finding may be reached where "defendant knew of and intended to further the illegal venture, that he somehow encouraged the illegal use of the goods or had a stake in such use." Beech-Nut Nutrition Corp., 871 F.2d at 1191 (quoting United States v. Zambrano, 776 F.2d 1091, 1095 (2d Cir. 1985)). Factors other courts have considered in considering whether an individual joined a conspiracy include the duration of the parties' cooperation, the level of mutual trust, the standardization of dealings, sales on credit, as well as the quantity of drugs involved. Hawkins, 547 F.3d at 74 (listing cases and factors). Although none of these factors is dispositive, the presence of several supports a reasonable inference that Defendant was a member of the conspiracy charged.

There is, for example, abundant evidence of Defendant's large-scale involvement in the purchasing and selling of thousands of ecstasy pills. This is sufficient to show that Defendant was not purchasing them merely for personal use or small-scale distribution. See United States v. Medina, 944 F.2d 60, 65 (2d Cir. 1991) ("[G]iven the quoted price of the cocaine, and the amount of buy money recovered . . . it is clear that the transaction was for wholesale quantities of cocaine . . . destined for resale.").

Defendant repeatedly asked for hundreds of pills on different dates. For example, on March 10, 2009, Defendant inquired:

Charles: No, I am asking, will you be able to get six hundred?

Abbey: Even if you want ten, ten thousand, I can get; are you crazy?

Charles: Okay, okay, okay, okay, okay.

Abbey: So tell them to gather their money, then when you come, you can get all at once.

(Gov.'s Ex. 11A.)[4]

On March 15, 2009, Defendant stated that he will "come back and possibly take another thousand." (Gov.'s Ex. 12A.) Indeed, Abbey's testimony reflects that Defendant at times sought to purchase more pills than he had to offer. On March 29, 2009, Abbey stated:

Abbey: Yeah, what is here is not enough you understand what I am saying?

Defendant: How many?

Abbey: Two hundred and a half.

Defendant: Oh, oh, okay, then I will wait till tomorrow.

(Gov.'s Ex. 23A.)

Again, on April 4, 2009:

Abbey: How many do you want?

Defendant: Five hundred.

Abbey: Oh, no, no, no . . . . I don't have that quantity. I called the guy but he would not pick up his phone. Wouldn't you wait and leave tomorrow?

(Gov.'s Ex. 29A.)

Abbey and Defendant also discussed the larger context of the drug conspiracy,

[4]Citations to conversations betwen Abbey and Defendant all refer to transcripts of wiretapped phone conversations admitted at trial. These conversations occurred between March 10 and April 13, 2009, and consisted of Abbey and Defendant speaking in a combination of English and Twi, a language of Guana. The passages quoted here are from the English translation transcript and do not reflect which portions of the text were spoken in Twi and which were spoken in English.

including the best way to smuggle drugs into the United States. On March 25, 2009, the two had the following exchange:

Defendant: You look for somebody, like somebody who can package the goods. He will test it and confirm that the goods are say .999. Once the quality is confirmed, whoever will swallow the goods will not be a problem. All you have to do is pay the one that will swallow and bring the thing, that's all.

Abbey: Yeah, that is why I want to make sure, because those cheatings that go on when somebody brings . . . .

Defendant: That is why . . . it is important that you must be in Ghana yourself.

Abbey: Yeah, if I get somebody who can bring it, then that is not a problem. If you can get somebody who will eat the thing and bring it down, I will pay the person so that he/she bring it.

(Gov.'s Ex. 21A.)

Numerous other conversations also reflect that Defendant did not operate merely locally. Instead, he traveled between New York and Chicago. Further, his and Abbey's conversations show them discussing the best, and safest, way to make these trips. For example, on April 4, 2009, Abbey inquired:

Abbey: How are you going with it?

Defendant: Bus.

Abbey: You have to be careful. Why do you want to take bus?

Defendant: Oh serious, serious; I am going to New York.

Abbey: Oh, you go and take it by air and they will arrest you and you will see.

(Gov.'s Ex. 29A.)

Other conversations show the two arguing about the proper way Defendant was to get the drugs from Abbey. A conversation on April 4, 2009 involved Abbey instructing Defendant that "[w]hen you are doing things with people, you never say anything to them" and that Defendant needed to contact him even when he was not coming. (Gov.'s Ex.

30A.) "You are supposed to communicate with me so that I can stop what I am doing and go and get the thing . . . ." (Id.)

Other passages show that Abbey was giving Defendant a special price for the narcotics. The price Abbey charged was "the price that I give you guys as my way of helping you, because I know you now want to start." (Ex. 11A.) While not exactly an extension of credit, it nevertheless shows the trust Abbey placed in Defendant. Abbey even trusted Defendant when it appeared that there was a disparity between the number of pills Abbey had given Defendant, and the number Abbey thought he received from his supplier.

Abbey: When you got there you realized that it was four hundred and a half.

Defendant: No, no, no trust me; if it was more, I would have told you, you know . . . serious.

Abbey: Now I am in debt . . . .

Defendant: How?

Abbey: Because . . . .

Defendant: Maybe your guy did not count it well.

Abbey: That is what I am saying, he did not count it well.

(Gov.'s Ex. 33A.)

Defendant's reliance on the Second Circuit's decision in United States v. Carpenter, 791 F.2d 1024 (2d Cir. 1986), *aff'd* 484 U.S. 19, 108 S. Ct. 316 (1987), which involved a reporter's acquittal on a conspiracy count, is misplaced. The defendant in that case provided securities-related information to two stockbrokers for use with specific individuals. That information was subsequently used beyond the scope of the original agreement. The court concluded that the defendant could not be held liable for those trades "as to whom

[defendant] had no agreement or knowledge." Id. at 1036. The court emphasized that this decision was the result of the narrowness of the agreement in question. Had the agreement been broader, or had the additional trades been reasonably foreseeable as a necessary or natural consequence of the unlawful agreement, or even had the defendant known of the other relationship, the result might have been different. Id.

Aside from the obvious factual differences in Carpenter, there is no indication that Abbey and Defendant here in any way limited their enterprise. To the contrary, the conversations detailed above show that the extent of the operation was restricted only by Abbey's ability to supply Defendant. These quantities also distinguish this case from others in which courts found the element of participation unproven. In United States v. Lopac, 411 F. Supp. 2d 350 (S.D.N.Y. 2006), for example, the court determined that a new trial was required to determine whether there was a sufficient degree of participation by defendant in the conspiracy. In that case, a chart introduced by the Government attributed 51 out of 168 narcotics packages to defendant. Id. at 368. The court determined, however, that the bulk of the evidence at trial showed that she actually only received packages on three separate instances. Id. at 368-69. The court noted that she was "on the outermost fringes of a conspiracy, her knowledge was limited by a manipulative boyfriend, and she evidenced intentions inconsistent with joining a conspiracy." Id. at 368.

Here, by contrast, Defendant was responsible for large quantities of narcotics, and personally discussed their sale, as well as the means by which to expand or improve the business. Also unlike that case, Defendant here clearly understood that he was only one part of the conspiracy. Although he purchased narcotics from Abbey, he then passed them on to other sources. On March 15, 2009, Abbey and Defendant had the following exchange:

Abbey: Are you taking it back to New York or you will be taking it to the guy?

Defendant: I will take it to the guy and collect the rest of the money.

(Gov.'s Ex. 12A.)

Defendant also knew that Abbey was involved with other individuals. On March 22, 2009, the pair discussed, in relevant part, the following:

Abbey: Yeah, but I have to be sure, because you did not come on time so I gave it to somebody, so . . . .

Defendant: What about the four one too?

Abbey: What did you say?

Defendant: Four.

Abbey: Stop saying it in English. You are such a fool. You could have said four hundred. I have to call the people and see, because since you did not come, I gave it to somebody yesterday.

(Gov.'s Ex. 18A.)

Defendant was again clearly aware that this operation was not limited to him and Abbey. On April 4, 2009, Abbey admonished Defendant, saying "[b]ut you never said anything to me and the guy also has been calling me. Listen, this is not how we work. You have to communicate effectively with me." (Gov.'s Ex. 30A.) That Abbey's supply was not going exclusively to Defendant was also made clear on April 6, 2009, when he said "[c]all me when you get there, because the goods that I gave you were more than you should get." (Gov.'s Ex. 31A.)

"We have frequently 'upheld convictions despite claims of multiple conspiracies, where the coconspirators knew with certainty that other suppliers and dealers existed, even though they did not know the others personally." United States v. Evans, 293 F. App'x 63, 67-68 (2d Cir. 2008) (summary order) (quoting United States v. Cambindo Valencia, 609

F.2d 603, 625 (2d Cir. 1979).

Considering this evidence, as well as the extent of the relationship between Abbey and Defendant, including the quantity of narcotics involved, the jury was free to infer that Defendant "participated in the alleged enterprise with a consciousness of its general nature and extent." United States v. Rooney, 866 F.2d 28, 32 (2d Cir. 1989) (quoting United States v. Alessi, 638 F.2d 466, 473 (2d Cir. 1980)). The same evidence, highlighting the quantity of pills Defendant was getting from Abbey, also supports the jury's verdict that the conspiracy involved 50 grams or more of methamphetamine. See United States v. Thompson, 528 F.3d 110, 119 (2d Cir. 2008) (evidence sufficient to show that defendants could reasonably foresee conspiracy to involve more than 50 grams of crack cocaine where testimony described frequent narcotics sales and defendants participated in daily sales of small quantities of crack cocaine).

Neither of Defendant's other arguments fares better. Defendant asserts that the Government cannot establish a connection between himself and the drugs identified in the indictment, and goes on to argue that neither the laboratory report nor Abbey's testimony can provide such support. As already discussed, the transcripts admitted at trial suffice to show that Defendant was part of a conspiracy beyond his relationship with Abbey. As a consequence, the fact that the narcotics included in the laboratory report are associated with other individuals to whom Abbey distributed drugs is sufficient to hold Defendant responsible.

But even if this were otherwise, the wiretap transcripts together with Abbey's testimony was sufficient to make clear that the object of the conspiracy was the distribution of ecstasy pills. Although neither Abbey nor Defendant used the word "ecstasy" or "pills," Abbey's testimony supports a jury's determination that the topic of the wiretapped

conversations was the sale and distribution of narcotics. After hearing each of the conversations admitted at trial, Abbey was asked what they concerned. In each case, Abbey stated that they referred to narcotics transactions. Further, a jury was free to infer from the conversations themselves that they were describing drug distribution. The conversations are littered with references to picking up quantities in their hundreds, and taking them to New York or Chicago. They also include Abbey warning Defendant not to speak in English. The conversations also refer to having someone in Ghana swallow a substance and bring it to the United States. Such discussions, and numerous others, together with the fact that Defendant admitted that he purchased ecstasy pills from Abbey for distribution to others, all sufficed to show that the conversations in question were about the illegal distribution of narcotics. Accordingly, Defendant's motion for acquittal as to the conspiracy charge will be denied.

Defendant's reasons for dismissing the second count of the indictment are dependant on arguments already discussed, and found insufficient. His motion for acquittal on the use of a communications facility charge will therefore also be denied.

## IV. CONCLUSION

For the reasons set forth above, Defendant's motion seeking a judgment of acquittal and a new trial is denied.

## V. ORDER

IT HEREBY IS ORDERED, that Defendant's Motion for Judgment of Acquittal and a New Trial (Docket No. 560) is DENIED.

SO ORDERED.

Dated: May 19, 2012
Buffalo, New York

/s/William M. Skretny
WILLIAM M. SKRETNY
Chief Judge
United States District Court